UNITED STATES DISTRICT COURT
EASTER DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

-vs-                                                                              Case No. 18-cr- 20240
                                                                            Hon. Linda V. Parker

SONJA EMERY,

    Defendant.

_____

## DEFENDANT'S SUPPLEMENTAL MOTION AND BRIEF TO APPOINT INDEPENDENT FORENSIC PSYCHIATRIST

Now comes Defendant, Sonja Emery, by and through her counsel, Mark H. Magidson, and in support of her motion to appoint an Independent Forensic Psychiatrist to assist the defense, states unto this Court as follows:

1. As this court is aware, Defendant currently has pending a motion before the Court to Appoint an Independent Forensic Psychiatrist.

2. While normally these motions are filed under seal, the circumstances are such that the Government is well aware of the efforts by the Defense to obtain a court-appointed independent expert.

3. Defendant had previously filed her motion claiming that the current expert that was selected by the the Government and paid by the Government an initial retainer of $15,000.00 came with "baggage" in that he worked for the same medical provider as Defendant's treating doctors, UCSF, albeit, different departments.

4. It was further claimed that this doctor had what could be termed "compensation bias" a situation that has been documented in the professional journals since he was paid by one party.

5. However in addition to the authority and arguments previously presented to the court, counsel has recently been advised of the completion of the 2017 Report of the Ad Hoc Committee to review the Criminal Justice Act, known as the Cardone Report.

6. This Committee, which consisted of Judges, Law Professors, U.S. Attorneys and Public Defenders was chaired by the Hon. Kathleen Cardone, U.S. District Court for the Western District of Texas.

7. The Committee made numerous recommendations as to how to improve the quality of legal service to clients who are served by attorneys paid from CJA funds.

8. Section 7.1.2 of the report pertains to the use expert services and it notes that "disparity in resources, between the panel and the Government attorneys or between the panel and federal defenders is most obvious when reviewing the use of experts or other service providers." See Exhibit A, excerpt of Cardone Report, p.149).

9. The Committee noted that there was "extensive use of experts by the government in the preparation and presentation of cases, from forensic experts employed by federal law enforcement agencies to private psychiatrists and neuropsychologists, whose rates for their services are 'substantially greater than what would be approved under the CJA'" ( See Exhibit A. P 149.)

10. The Committee notes that "Service providers—-whether investigators, paralegals or discovery coordinators—are critical to effective representation. (See Exhibit A, p. 149.)

11. Because panel attorneys must seek judicial approval for service providers and experts, significant disparities exist in some districts between the number of cases in which service providers and experts are used by panel attorneys, as compared to the number of cases in which such services are employed by FDOs and CDOs. (See Exhibit A, p.151)

12. The overall thrust of the Report is the encourage panel attorneys representing clients in appointed cases to make use of experts and that judges should be encouraged to grant such requests to "even the playing field."

WHEREFORE, for the foregoing reasons, Defendant is requesting that this Court allow Ms. Emery to be evaluated by another independent forensic and that this Court appoint Gerald Shiener, M.D. or another qualified forensic expert as the expert in this case.

Respectfully submitted,

By */s/Mark H. Magidson*
MMAG100@AOL.COM
MARK H. MAGIDSON (P25581)
Attorney for Defendant
615 Griswold, Suite 810
Detroit, MI 48226
(313) 963-4311

## CERTIFICATE OF SERVICE

I certify that on November 21, 2019 I electronically filed the above *Supplemental Motion and Brief to Appoint Independent Forensic Psychiatrist* with the Clerk of the Court using the ECF system, which will send notification of such filing to the parties of record.

> By: /s/*Mark H. Magidson*
> MARK H. MAGIDSON (P25581)
> Attorney for Sonja Emery

*Exhibit*

*A*

Another panel attorney testified that when the public defenders try a case, "there's always two lawyers, there's almost always a paralegal in the courtroom, as well as an investigator, and if they need other staff they're there as well. It's unfortunate, I do everything I can on my appointed cases... but it's almost inevitable that there's a disparity" when a defendant does not have the benefit of being represented by a public defender.[686]

Finally, one panel attorney explained that panel attorneys simply want parity with federal defenders in their ability to access resources to close the quality gap. She told the Committee that she hoped what would come from this CJA review are solutions "that free up CJA counsel, give us the resources that we want, give us the ability to access them quickly like the federal defender has. Literally, I want what they want, they have. I want the resources that the federal defender has."[687]

### 7.1.2 Expert Service Providers

Disparity in resources, between the panel and government attorneys or between the panel and federal defenders is most obvious when reviewing the use of experts or other service providers. Testimony showed the extensive use of experts by the government in the preparation and presentation of cases, from forensic experts employed by federal law enforcement agencies[688] to private psychiatrists and neuropsychologists, whose rates for their services are "substantially greater than what would be approved under the CJA."[689] As a magistrate judge described his experience as a former assistant U.S. attorney, "in my prosecutions, I always had a primary case agent, and routinely supplemented his/her expertise with a financial analyst/accountant and other experts like medical doctors, chemists, finger print analysts, etc."[690]

Service providers—whether investigators, paralegals, or discovery coordinators—are critical to effective representation. Investigators, for example, are used by the government in every case and federal defenders in nearly every case. Investigators "locate and interview potential witnesses, obtain copies of police reports and criminal records of convictions, engage in background investigations of potential witnesses, photograph crime scenes or areas relevant to criminal allegations, meet with the client and his family on certain issues," among other valuable services.[691] These are tasks required by every case that does not settle quickly. This is true even when the government provides full discovery and even when that

---

[686] Daniel Albregts, CJA Dist. Rep., D. Nev., Public Hearing—San Francisco, Cal., Panel 4, Tr., at 41.
[687] Lori Nakaoka, CJA Panel Atty., D. Idaho, Public Hearing—Portland, Or., Panel 5, Tr., at 8.
[688] Lynn Panagakos, CJA Dist. Rep., D. Haw., Public Hearing—San Francisco, Cal., Panel 4, Writ. Test., at 3.
[689] Joseph St. Amant (submitted via Judge Marcia Crone), Senior Appellate Conference Atty., 5th Cir., Public Hearing—Birmingham, Ala., Panel 1, Writ. Test., at 6.
[690] Mag. Judge Charles Coody, M.D. Ala., Public Hearing—Brimingham, Ala., Writ. Test., at 2.
[691] Mag. Judge William Matthewman, S.D. Fla., Public Hearing—Miami, Fla., Panel 3, Writ. Test., at 3.

discovery seems to show that the client is clearly guilty. A panel lawyer's story of an arson case to which he was appointed illustrates this point vividly:

> From the discovery, [my client] appeared culpable. Very culpable. I instructed my investigator to interview every person named in the discovery because the police reports were sketchy. I also kept asking the prosecution for the interview of one named witness that was omitted from the discovery. My investigator eventually was able to contact the omitted witness. He was an uninvolved passerby who confirmed completely the defendant's story that she was just standing there and her companion broke the window, started the fire, and then told her, "You'd better run." The charges against her were dismissed, and she was released from jail. In the aftermath, I laid in bed staring at the ceiling, feeling I had narrowly avoided allowing a horrible injustice to occur.[692]

Assistance of other experts is essential in many cases. A panel attorney offered the Committee a succinct explanation for expert use:

> [First, they can] assist a lawyer in understanding the facts [of a case]. Second, an expert can help determine why a defendant acted as he or she did .... Third, an expert may be instrumental in providing the defense attorney information about the defendant that supports a reduction in the charges or a lesser sentence because of the history and characteristics of the defendant .... The bottom line is: using an investigator and expert more often than not makes a difference in the outcome of the case. The prosecution is more likely to negotiate a reduction in the charges or to agree to a lesser sentence or not oppose the defense request for a lesser sentence.[693]

Experts are especially valuable at sentencing in the wake of the Supreme Court's decision in *United States v. Booker*.[694] Now that the federal sentencing guidelines are advisory and not mandatory, "psychiatric or psychological experts may be the only way to individualize the defendant, to demonstrate" that a sentence is sufficient but not greater than necessary, as required by 18 U.S.C. 3553(a).[695]

Furthermore, the "explosion in financial fraud and child pornography cases"[696] has necessitated greater use of experts, including specialists in forensic computing, forensic accounting, and mental health. However, the need for experts is not limited to such cases; in securities fraud cases, experts are needed to analyze and interpret

---

[692] Shaun McCrea, CJA Panel Atty., D. Or., Public Hearing—Portland, Or., Panel 4,Writ. Test. at 5-6.
[693] *Id.* at 6-7.
[694] 543 U.S. 220 (2005).
[695] Judge Nancy Gertner (ret.), D. Mass., Public Hearing—Philadelphia, Pa., Panel 2b, Writ. Test., at 4.
[696] Michael Caruso, FPD, S.D. Fla., Public Hearing—Miami, Fla., Panel 1, Writ. Test., at 11.

**150**   2017 REPORT OF THE AD HOC COMMITTEE TO REVIEW THE CRIMINAL JUSTICE ACT

No recommendation presented herein represents the policy of the Judicial Conference of the United States unless approved by the Conference itself.

market data;[697] in national security cases, interpreters are needed to review discovery in foreign languages like Arabic, Pashto and Urdu; and in other cases, "emerging technologies, including location-based tracking techniques such as GPS and cell-site tracking data, frequently require expert review."[698]

FPDOs and CDOs typically have investigators on staff and rely upon their services in most of their cases. In fact, in many federal defender offices, "every case is staffed with a staff investigator."[699] Similarly, these offices usually have the funds necessary to secure other expert assistance when needed.

Because panel attorneys must seek judicial approval for service providers and experts, significant disparities exist in some districts between the number of cases in which service providers and experts are used by panel attorneys, as compared to the number of cases in which such services are employed by FDOs and CDOs.

Comparing the work of his office to the panel attorneys in the Northern District of Texas, the Federal Public Defender noted that he "employ[s] ten investigators and paralegals on staff," without which his colleagues "would find it extremely difficult to represent clients."[700] Yet in fiscal year 2014, panel attorneys in his district sought and secured service providers of any kind in only 4.5 percent of their representations.

Similar disparities exist in other districts. The federal defender in the District of Puerto Rico explained that while he had only twice as many cases as the panel, his office spent ten times as much on expert and professional services.[701]

**Panel Attorneys' Usage Rates of Service Providers—
U.S. District Courts in North Carolina, FYs 2013 and 2014**

| Districts in North Carolina | Average usage FY 2013 | Average usage FY 2014 |
| --- | --- | --- |
| Eastern District | 32 percent | 40 percent |
| Middle District | 4 percent | 1 percent |
| Western District | 2 percent | 2 percent |

Empirical data, which included three national surveys conducted by the Westat research group[702] of judges, panel representatives and attorneys, public defenders, and resource counsel, plus payment information from the system utilized by the AO before eVoucher,[703] show a low rate of expert usage by panel attorneys. Data from the payment system in fiscal years 2011–2014 showed that across

---

[697] *Id.*

[698] *Id.*

[699] Lisa Freeland, FPD, W.D. Pa., Public Hearing—Santa Fe, N.M., Panel 3, Tr., at 3.

[700] Jason Hawkins, FPD, N.D. Tex., Public Hearing—Santa Fe, N.M., Panel 2, Writ. Test., at 6.

[701] Eric Vos, FPD, D.P.R., Public Hearing—Miami, Fla., Panel 1, Writ. Test., at 5.

[702] Westat Survey. See Appendix C: Survey Data Considered.

[703] Information drawn from 6x payment system provided to the Committee. See Appendix G.

No recommendation presented herein represents the policy of the Judicial Conference of the United States unless approved by the Conference itself.

2017 REPORT OF THE AD HOC COMMITTEE TO REVIEW THE CRIMINAL JUSTICE ACT **151**

Case 2:18-cr-20240-LVP-RSW ECF No. 92, PageID.694 Filed 11/21/19 Page 9 of 13

the country CJA panel attorneys on average used service providers in only 14 to 15 percent of their cases.[704] During this same period, utilization of such services in several districts was as low as one percent.[705] The highest use was 53 percent for one district in only one fiscal year.[706] This compares to federal defenders who told the Committee that they use service providers in all of their cases.

**Over the last five years, in what percentage of your cases have you sought permission of the court to engage a service provider (e.g., investigator, paralegal or other expert*) in a non-capital case?**



*Interpreters/translators are not included in this question.
Source: CJA Review Committee Survey on Use of Service Providers (June 2016), available at https://cjastudy.fd.org.

The Committee reviewed data about panel attorneys' utilization of service providers in non-capital, non-immigration matters. Over the course of the last three fiscal years, the district with the highest rate of use was the Middle District of Tennessee, where CJA lawyers employed a service provider in just under half of all representations. By contrast, panel attorneys in the Southern District of Alabama employed a service provider in two percent of representations. The Northern District of Mississippi reported the very same two percent rate of usage, and the Southern District of Georgia and the Western District of Arkansas showed similar data.

Within a state, districts vary in usage rates and average payments. In one state, each of three districts had widely varying uses of experts, ranging from a high in one district of 40 percent to a low of 1 percent in the neighboring district.[707]

The Committee conducted its own survey of panel attorneys to learn more about their usage of service providers. The results from those surveys are consistent

---

[704] *Id.* Data does not include service providers in capital cases, immigration cases, or interpreters.
[705] *Id.*
[706] *Id.*
[707] *Id.*

No recommendation presented herein represents the policy of the Judicial Conference of the United States unless approved by the Conference itself.

with other evidence on expert use by panel attorneys. As the table above indicates, sixty percent of lawyers in the Committee's survey said that they employ a service provider less than ten percent of the time. In fact, fewer than 12 percent of panel attorneys have requested a service provider in a majority of their cases. When asked why they do not seek service providers, almost 84 percent of responding panel attorneys said that most of their cases do not include issues that warrant assistance. These responses are provided in the following table. At hearings, panel attorneys offered similar explanations, but the responses stand in contrast to the practice of federal and community defenders, who regularly employ permanent investigators and paralegals in their cases and who testified to the importance and value of such assistance.

**If you have not sought to engage a service provider in a non-capital case, why is this so?**



| Response | Percentage |
|---|---|
| There weren't issues that would warrant assistance | 83.37% |
| I preferred to handle the matter myself | 23.44% |
| I was not familiar with appropriate service providers | 6.81% |
| There aren't available service providers in my area | 3.12% |
| I was unaware of the process to engage a service provider | 5.37% |
| I thought it would too greatly reveal case strategy | 4.04% |
| The process to seek permission is too cumbersome | 16.58% |
| The process to obtain reimbursement is too time-consuming | 11.92% |
| A case budgeting attorney recommended against it | 0.61% |
| A public defender recommended against it. | 0.26% |
| I thought the court would deny the request | 8.85% |
| I thought the court might fail to appoint me in future cases | 3.63% |
| Other | 11.11% |

Source: CJA Review Committee Survey on Use of Service Providers (June 2016), available at https://cjastudy.fd.org.

Some panel attorneys indicated that they prefer to handle the issue themselves and conduct their own investigations in lieu of employing an investigator. Panel attorneys also offered this explanation at the Committee's hearings. One public

defender explained that there are financial incentives for panel lawyers to complete the investigation themselves:

> [For] the majority of the panel attorneys...their sole source of income is what they earn off of appointments. If they can do the work themselves and bill out that two, three, or four hours then they get money they otherwise would not.... It appears that what they're wanting to do is to try to maximize the amount of money they can earn on each case, and one of the ways they try to do that is not ask for experts but rather do it themselves[708]

The Committee also heard other explanations for the low rate of service providers. In rural areas, such as the Dakotas, Wyoming, and New Mexico, it was reported that particular types of experts are in short supply, making it "difficult to engage them on appropriate cases due to schedule, physical proximity, and conflicts with their other obligations."[709] Nationally, some panel attorneys explained that they rely on investigators and expert assistance provided by the FDO when assisting a client whose co-defendant is represented by the public defender. Others testified that they can obtain the same information as an investigator through other means and at a lower price. As one federal defender explained, though all cases can benefit from an investigator, in illegal re-entry cases one of the key issues is the defendant's "prior convictions, which you can get on a computer," thus saving the cost of an investigator.[710]

These explanations do not fully account for the low rates at which panel attorneys use experts. Some witnesses believed the phenomenon was explained by the differing cultures of districts. Rates of expert usage show systematic, geographic differences, reflective of what one district judge called "a matter of court culture and what people expect."[711] "I think most of it is culture," a federal defender told the Committee, and further noted, "I think most people are solo practitioners, come out of state court where they just don't use experts much. I think all cases can benefit from experts."[712] A judge echoed this point, testifying that "notwithstanding that this topic is covered in educational seminars, CJA panel attorney members simply may not be aware of the variety of investigative and expert services for which compensation is available under the CJA."[713] Or, as a federal defender, testified:

> I think it's also that [panel attorneys have] not used experts in the past. They don't know how to work with one, they don't know what type of

---

[708] Bruce Eddy, FPD, W.D. Ark., Public Hearing—Birmingham, Ala., Panel 6, Tr., at 26.
[709] Neil Fulton, FPD, D.S.D. & D.N.D., Public Hearing—Minneapolis, Minn., Panel 2, Writ. Test., at 5.
[710] Marjorie Meyers, FPD, S.D. Tex., Public Hearing—Birmingham, Ala., Panel 6, Tr., at 36.
[711] Chief Judge Catherine Blake, D. Md., Public Hearing—Philadelphia, Pa., Panel 1, Tr., at 24.
[712] Marjorie Meyers, FPD, S.D. Tex., Public Hearing—Birmingham, Ala., Panel 6, Tr., at 36.
[713] Mag. Judge Charles Coody, M.D. Ala., Public Hearing—Birmingham, Ala., Writ. Test., at 2.

No recommendation presented herein represents the policy of the Judicial Conference of the United States unless approved by the Conference itself.

information to give them. They don't know the advantages that an expert can bring to your case whether you're going to trial or whether it's mitigation for sentencing expert. They just don't know how to take the information that an expert can bring them and then what to do with it. I think there's a lot of that, they're just uncomfortable. They've never used them, don't know how to use them.[714]

Comparing her district to another district where panel attorneys regularly employ paralegals, a panel representative explained the attorneys don't feel "entitled to use a paralegal in every case. It's a cultural thing, and I think that maybe we don't have strong leadership in the CJA community. We are kind of on our own, and we look to our judges for what we are thinking is the appropriate use of resources."[715] In another district, a panel attorney identified culture and lack of institutional support as a problem as well: "We've got a good panel, but there is timidity. Those same people are timid about applying for experts and investigators…we've got to change the culture."[716] However, there is currently no support to change that culture, the attorney explained. "In our area, our neck of the woods so to speak, we have a community federal offender organization. Good people, really talented lawyers as well, but they operate as kind of a private law firm separate and apart from us, the panel."[717]

These cultural explanations carry some weight, but like the reasons offered by panel lawyers in response to the Committee's survey, they are not a full explanation. Ultimately, it is clear that requiring judicial approval of expert services requests deters some attorneys from seeking necessary assistance. Multiple panel lawyers testified about the "chilling effect"[718] the current approval process has, in addition to it being a "time-consuming [and] cumbersome procedure that goes uncompensated for the lawyers."[719]

Attorneys may also find themselves in an unpleasant negotiation with the presiding judge on the expert fees. As a panel representative in one such district described her experience:

> Routinely, when I request an expert and I say, "Look. I've talked to the expert. This is what they charge. This is how many hours I think I'm going to need. This is the amount I'm asking for," I'm not approved for

---

[714] Bruce Eddy, FPD, W.D. Ark., Public Hearing—Birmingham, Ala., Panel 6, Tr., at 35.

[715] Lori Nakaoka, CJA Panel Atty., D. Idaho, Public Hearing—Portland, Or., Panel 5, Tr., at 40–41.

[716] Edward Hunt, CJA Panel Atty., E.D. Wis., Public Hearing—Minneapolis, Minn., Panel 4, Tr., at 22–23.

[717] *Id.* at 23.

[718] Lori Nakaoka, CJA Panel Atty., D. Idaho, Public Hearing—Portland, Or., Panel 5, Tr., at 41.

[719] As an attorney explained, "Most panel lawyers are small firm or solo practitioners, so they must rely on the court to fund the extraordinary expenses of the case. The time they must spend to file motions and memoranda and attend hearings to justify obtaining necessary defense resources…on investigators, experts, translators, forensic accountants, paralegals, document management, technical aid and the like, is often excessive and intrusive." Rochelle Reback, Former CJA Panel Atty., M.D. Fla., Public Hearing—Miami, Fla., Panel 5, Writ. Test., at 6–7.

the amount I'm asking for. I'm just trying to think...if there's been an explanation or if it's just been the judge crossing the amount out and just saying, "I'm just going to give you $2500 right now." Then I had to go back several times."[720]

If multiple experts are required, the attorney will have to repeat this process multiple times, on each occasion disclosing information concerning the proposed defense.[721] In addition, attorneys sometimes face requests from the judge presiding over the case to seek a reduced rate from the selected expert. Multiple lawyers spoke of the challenge of recruiting "qualified experts willing to handle CJA appointments at hourly rates which are non-competitive in the private sector."[722]

As one panel attorney noted, ultimately, "judicial involvement in management of resources can negatively impact the quality of our representation,"[723] creating the current disparity between CJA panel attorneys and federal defenders. Another panel attorney was emphatic in stating that judicial review of expert requests entrenches resource disparities and unfairness:

> There is categorically, from my perspective as a defense lawyer, no reasonable, logical, ethical, lawful explanation why there should be a distinction between the defense function and the prosecution function. There is no reason why as defense lawyers we should have to go to the judiciary and basically be beholden to their largess...The prosecution doesn't go through these machinations. We should not have to. It certainly impacts on the quality of representation.[724]

### 7.1.3 Attorney Effort

The low use of expert services by panel attorneys is the most visible disparity in resources between panel lawyers, federal defenders, and government attorneys. But limits on the time panel attorneys can devote to a representation are even more critical. The ways in which judicial management of panel lawyers' compensation serves to limit attorney effort are discussed fully in Section 5 on compensation. They include the refusal to pay for categories of work, bench marks for how much a type of case should cost, and "pro bono" voucher cuts. In these and many

---

[720] Jennifer Horwitz, CJA Dist. Rep., W.D. Wash., Public Hearing—Portland, Or., Panel 5, Tr., at 41.

[721] The maximum compensation for investigative, expert, and other services without prior authorization is $800. *See* 7 Guide to Judiciary Policy § 310.20.30 (2013).

[722] Gilbert Schaffnit, CJA Dist. Rep., N.D. Fla., Public Hearing—Miami, Fla., Panel 6, Writ. Test., at 6. For example, as a panel lawyer told the Committee, "the approved rate for a forensic accountant is $150 per hour. However, the 'going' rate charged by a forensic account is approximately $270 [per hour] for a partner, $185 for a manager, and $140 for an associate." David Eisenberg, CJA Dist. Rep., D. Ariz., Public Hearing—Santa Fe, N.M., Panel 6, Writ. Test., at 4.

[723] Lori Nakaoka, CJA Panel Atty., D. Idaho, Public Hearing—Portland, Or., Panel 5, Tr., at 41.

[724] Robert LeBell, CJA Dist. Rep., E.D. Wis., Public Hearing—Minneapolis, Minn., Panel 4, Tr., at 3.

**156**   2017 REPORT OF THE AD HOC COMMITTEE TO REVIEW THE CRIMINAL JUSTICE ACT

No recommendation presented herein represents the policy of the Judicial Conference of the United States unless approved by the Conference itself.